834 A.2d 1104

**Brian KENNEDY and Susan Kennedy, Husband and Wife**

v.

**UPPER MILFORD TOWNSHIP ZONING HEARING BOARD, Richard C. Dean, Robert Salaski, T. Richard Parker, MaryLou Stefanko, Individually and The Pennsylvania Turnpike Commission,**

**Brian Kennedy and Susan Kennedy, Husband and Wife**

v.

**Upper Milford Township Zoning Hearing Board and The Pennsylvania Turnpike Commission,**

**Appeal of the Pennsylvania Turnpike Commission.**

Supreme Court of Pennsylvania.

Argued May 13, 2003.

Decided Oct. 27, 2003.

Jeffrey F. Champagne, David E. Lehman, Harrisburg, for Pennsylvania Turnpike Commission, Appellant.

Eleanor N. Ewing, Nelson A. Diaz, for City of Philadelphia, Appellant Amicus Curiae.

Anne K. Manley, Kimberly G. Krupka, Allentown, for Brian Kennedy et al.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Justice LAMB.

We granted allowance of appeal in this case in order to clarify the relationship between the "open meeting" requirement of the Commonwealth's Sunshine Act[1] and the quasi-judicial deliberative responsibilities of local zoning hearing boards.[2] We hold that quasi-judicial deliberations are a proper subject of private executive sessions.

1. Act of October 15, 1998, P.L. 729, No. 93 ("1998 Sunshine Act"), *as amended,* 65 Pa.C.S. §§ 701–716. 65 Pa.C.S. § 704 states the general rule, with exceptions there enumerated: "Official action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public...."

2. Each municipality which enacts a zoning ordinance must create a zoning hearing board ("zoning board"), Section 901 of the Pennsylvania Municipalities Planning Code, the Act of July 31, 1968, P.L. 805, No. 247, *as amended* ("MPC"), 53 P.S. § 10901, consisting of either three or five resident members appointed to staggered three-or five-year terms by resolution of the governing body. MPC § 903, 53 P.S. § 10903. Zoning boards have jurisdiction of appeals from decisions of the municipal zoning officer and municipal engineer administering the local land planning and land use regulations, substantive and procedural challenges to the validity of land use and land planning ordinances, applications for special exception where a particular land use is so designated in the zoning ordinance, and applications for variance relief from enforcement of the literal terms of the zoning ordinance. MPC § 909.1, 53 P.S. § 10909.1. The zoning board's decisions must be made following a public, stenographically recorded hearing conducted on written, advertised, and posted notice during which each party has the right to be represented by counsel and must be afforded the opportunity to present evidence, respond to the evidence presented by other parties, and to cross-examine adverse witnesses. MPC §§ 908(1), (5), and (7), 53 P.S. §§ 10908(1), (5), and (7). The board's chairman has the power to administer oaths and to issue subpoenas to compel the attendance of witnesses and the production of documents. MPC § 908(4), 53 P.S. § 10908(4). Where the application is contested or denied, the board's decision must be accompanied by factual findings, legal conclusions, and a statement of reasoning. MPC § 908(9), 53 P.S. § 10908(9).

The Commonwealth of Pennsylvania Turnpike Commission ("Commission") as the owner of a small parcel of land[3] improved since the 1950's with a radio communications tower and located on South Mountain in Upper Milford Township ("Township"), Lehigh County, applied to the Township Zoning Hearing Board ("Board" or "ZHB") for relief needed to increase the height of the tower from the existing 120 feet to 210 feet as initially proposed and 200 feet as the application was subsequently amended. The 120–foot tower located on the property at the time of the instant application, was erected by the Commission in 1981 and has been continuously used since that time as a critical link in the analog radio communications that serve the Northeast Extension of the Pennsylvania Turnpike[4] for such purposes as transmitting toll data, receiving signals from the emergency call boxes available to stranded motorists and located along the length of the highway at one mile intervals, and summoning the assistance of towing services and the state police.

In performing these functions, it is necessary for the Commission's South Mountain tower to communicate with towers located in Valley Forge in Montgomery County to the south and Palmerton in Lackawanna County to the north. The nature of the microwave radio energy used in the system necessitates a clear line of sight between the towers. In the decades since their erection, tree growth in the intervening lands between the South Mountain tower and that in Valley Forge[5] has increasingly interfered with the signal. In order

3. The parcel is fifty feet by one hundred feet in dimensions or about one tenth of an acre in area. The Township zoning regulations require in the case of communication towers, a setback distance from the tower base to each property boundary equal to the tower height (the so-called "fall distance"). A parcel of the minimum area sufficient to provide a 200 foot setback from the Commission's tower base to all boundaries would contain about 125,600 square feet or about three acres.

4. The Pennsylvania Turnpike's Northeast Extension was redesignated on November 1, 1996 as Interstate Highway I-476. This highway, some 110 miles in length from Interchange 20 east of Valley Forge north to Scranton and Route I-81, was opened to traffic on November 7, 1957.

5. The distance between the Valley Forge and South Mountain towers, about 31 miles, is at the extreme range for the analog radio technology presently employed by the Commission.

to ameliorate this problem and to facilitate the conversion of the system to the greater capacity permitted by digital technology, the Commission sought the increase in tower height here at issue. Evidence adduced by the Commission at the hearing before the Board on remand from the trial court established that a tower height of 175 feet and an antenna height of 180 feet would be sufficient for these purposes.

An initial hearing before the Board was conducted on May 12, 1997 and, by decision dated June 26, 1997, the requested relief was granted. Brian and Susan Kennedy ("the Kennedys"), as neighboring property owners opposed to the increase in tower height, were then permitted by the Court of Common Pleas of Lehigh County to appeal from the Board's decision *nunc pro tunc* and, by order entered December 8, 1998 and amended on December 15, 1998, the court vacated the Board's decision and remanded the matter to that tribunal for proceedings *de novo*.

Following the remand, the Board conducted an evidentiary hearing on January 11, 1999, and at the close thereof, by a vote of three to one, granted special exception and variance relief to permit construction of a 180–foot high communications tower while requiring other aspects of the Commission's proposal including the addition of an equipment storage structure, to be referred to the Township planning commission for additional review. In a written decision, the Board found and concluded inter alia that the Commission's proposal included the removal of the existing 120–foot tower and construction at the same location of a tower 200 feet in height to be used by the Commission for radio communications along the Pennsylvania Turnpike's Northeast Extension, by Omni–Point Communication Enterprises, L.L.P. ("Omni–Point") as lessee for commercial cellular telephone service and, if the Commonwealth so elected, as a component of a state-wide emergency communication network; that the subject property is located in the South Mountain Conservation Zoning District as defined and regulated by the Township's zoning ordinance in which a "radio/television transmitter or receptor"[6] is a use of

6. Zoning ordinance § 201(A)(6) defines the term "Radio/TV Transmitter or Receptor" as "[a]ny structure used for the transmission, retransmis-

land permitted by special exception; that Township zoning ordinance § 312(E)(57)(b) requires that such "antenna or tower shall be set back a distance equivalent to the height of the antenna or tower from all property lines ...."; that the proposed use fails to comply with this minimum setback requirement; but that the property's physical characteristics, including its size and configuration, combine with the setback regulation and the demonstrated fact that a tower less than 175 feet in height at this location would not function as required to serve the needs of the Commission and motorists, to produce unnecessary hardship sufficient to justify the grant of variance relief from the setback regulation.

However, the Board further concluded that the tower height as proposed initially (210 feet) or as the application was subsequently amended by the Commission (200 feet) had not been demonstrated to be the minimum variance that would afford relief from the hardship proved as required by the zoning ordinance and by MPC § 910.2(a)(5), 53 P.S. § 10910.2(a)(5). Since the Commission's evidence was that an antenna height of 180 feet would suffice, the Board granted the requested variance subject to the condition that the proposed tower be reduced in height to 180 feet.[7]

The Kennedys perfected a zoning appeal in the trial court and simultaneously commenced an action in declaratory judgment seeking a determination that the Board's action approving a modified tower proposal violated the 1998 Sunshine Act and was, on that account, void. The Sunshine Act complaint centered factually on a recess taken by the Board during the

sion or reception of a commercial radio or TV broadcast signal." The Board concluded on the basis of this definitional provision and the term's commercial denotation that the Commission's proposal could be so categorized only because of the co-location on the proposed tower of Omni–Point's facilities. Ironically, as will be discussed below, the Board's decision rendered Omni–Point's use of the tower impractical and the cellular telephone provider later relinquished its right to locate facilities on the tower and is no longer involved in these proceedings. However, no issue or argument has here been raised concerning the proper categorization of the tower proposal for zoning use purposes.

7. The evidence was that the proposed dish antenna, located at a tower elevation of 175 feet, would be at the minimum elevation of 180 feet.

course of the January 11, 1999 hearing following the conclusion of evidence and argument and immediately prior to the Board's formal action. In its written decision, the Board describes this interregnum as "a lawful deliberation pursuant to Section 8 of the Sunshine [Act]." R.R. 176a.[8]

The trial court consolidated the Kennedys' zoning appeal and declaratory judgment action and, by order of June 30, 2000, denied the appeal, affirmed the decision of the Board, and dismissed the Sunshine Act complaint. With respect to the latter, the trial court concluded that the Kennedys had failed to meet their burden to prove wrongdoing[9] particularly in the absence of any attempt, by deposing Board members or commanding their presence at trial, for example, to establish the nature and substance of any conversations or action taken during the recess.

On the Kennedys' further appeal, a panel of the Commonwealth Court reversed the order of the trial court insofar as it had dismissed the action in declaratory judgment seeking a determination of Sunshine Act violation on the part of the Board. *Kennedy v. Upper Milford Tp. ZHB*, 779 A.2d 1257 (Pa.Cmwlth.2001). The court emphasized the Board's judicial admission that it had conducted "quasi-judicial deliberations" during the recess, and further reasoned:

> Moreover, the ZHB chairman, after the recess, simply announced that "we'll vote" not to approve the 200 foot tower but to approve a 180 foot tower. (R.R. at 160a.) The chairman could not have known how the ZHB would vote unless the vote had been predetermined. Because the ZHB determined how it would vote without conducting a public meeting, the ZHB violated the Sunshine Act.

8. The Board's statutory reference apparently invokes the provisions having to do with executive sessions now codified at Section 708 of the 1998 Sunshine Act, 65 Pa.C.S. § 708, which were previously the subject of Section 8 of the Act of July 3, 1986, P.L. 388 (the "1986 Sunshine Act"); a prior version of the open meeting legislation.

9. The trial court cited *George Clay Steam Fire Engine and Hose Co. v. Pennsylvania Human Relations Comm'n*, 162 Pa.Cmwlth. 468, 639 A.2d 893 (1994), *appeal denied*, 540 Pa. 614, 656 A.2d 120 (1995), for the proposition that the burden to prove wrongdoing under the Sunshine Act is on the complainant.

779 A.2d at 1260. The court rejected the Board's contention that the recess was a lawful executive session, reasoning:

the ZHB's quasi-judicial deliberations were not the sort that, if conducted in public, would violate a lawful privilege or lead to the disclosure of information or confidentiality protected by law. Therefore, the ZHB's recess does not constitute an executive session under section 708(a)(5) of the [1998] Sunshine Act.

*Id.* On this basis, the panel rejected the trial court's conclusion that the Kennedys, as complainants, had adduced insufficient evidence of unlawful official action taken by the Board during the recess; as well as the Board's contentions that the recess constituted a lawful executive session and that any violation of the Sunshine Act was cured by the subsequent action in public. The Commonwealth Court held that the trial court abused its discretion by failing to invalidate the Board's action in granting relief for a 180–foot tower.

Now before us is the Commission's appeal, the evaluation of which requires that we review in some detail the nature and substance of the proceedings conducted by the Board on January 11, 1999. It was, after all, these proceedings and the Board's conduct therein that the Commonwealth Court determined to have been unlawful and, therefore, void and of no effect.

As we have noted, a hearing on remand from the court of common pleas was conducted by the Board in the matter of the Commission's application on January 11, 1999[10] at which the Commission as property owner and applicant, Omni–Point as co-applicant and prospective commercial lessee[11] of space on the proposed tower, and Brian and Susan Kennedy as neighboring property owners in opposition to the application; each represented by counsel, entered their appearance. Prior to

10. By orders dated December 8 and 15, 1998, the court of common pleas remanded the matter of the Commission's application to the Board for further proceedings including the participation of objectors Brian and Susan Kennedy. The hearing conducted by the Board on January 11, 1999 was held in response to the said orders.

11. The lease between the Commission and Omni–Point required the latter to construct the new tower.

the introduction of evidence, the Kennedys' counsel requested the recusal of Board chairman Dean and Board member Delorenzo[12] and counsel for Omni–Point requested the recusal of Board member Salasky. Chairman Dean and Member Salasky refused these requests. Member Delorenzo recused himself from further participation in the hearing and from the Board's decision.

The parties proceeded with the hearing. Specifically, a Commission communication field technician described the agency's need for additional communications' capacity and the plan to accomplish this end by conversion to digital technology utilizing the radio tower on South Mountain.

One of the Commission's consulting engineers was called to describe the method used and the data consulted to determine the minimum necessary height of the tower and the configuration and alignment of the proposed ultra-high performance antenna. On cross-examination by the Kennedys' counsel, the witness rejected the possibility that an alternative tower proposed for the Lehigh Valley Turnpike interchange could substitute in the overall system for the South Mountain tower and explained the basis for his opinion that the South Mountain site is the most suitable for the proposed use. On redirect examination, the witness testified that an increase in the height of each of the Commission's towers would be required by the conversion to digital technology with a number of the towers to the north of the subject site requiring an increase to more than 300 feet. With some prodding by the Board's chairman, the witness categorized the Commission's proposal as the modernization of an existing use intended to better serve the traveling public. In response to Board Member Stefanko's inquiry, the witness confirmed that the Commis-

12. Chairman Dean was challenged on the ground of his position as the principal shareholder and chief executive officer of a local television broadcast station using communication towers throughout the region. Member Delorenzo was challenged on the basis of his decision to recuse himself from the application on initial consideration by the Board. Member Salasky was challenged for having taken a public position in opposition to communication towers generally and to the instant application in particular. No issue concerning these requests for recusal is presently before us.

sion's needs would be satisfied by an about eight foot diameter dish antenna mounted on the South Mountain tower at an elevation of 175 feet.

The Commission next called its wireless radio frequency engineer as an expert witness prepared to testify on radio frequency emissions and the health effects of exposure to such radiation. However, the Board concluded that it lacked authority to consider such matters by force of the Telecommunications Act of 1996[13] and, with the agreement of all counsel, the witness was excused.

A civil engineer providing consulting services to Omni–Point then described the revised and reissued land development plan submitted to the Board to demonstrate compliance with the objective zoning ordinance standards (apart from those concerning which relief had been sought in these proceedings) as well as the recommendations made by the Township Planning Commission. Particular emphasis was placed on those aspects of the plan which differed from that submitted prior to the trial court's December 1998 remand orders, including a reorientation of the tower at the same location, the addition of an equipment storage structure, and depiction of a landscaped buffer requested by the Township planning Commission. On cross-examination, the witness conceded that certain aspects of the site plan failed to comply with applicable dimensional

**13.** Pub. Law No. 104–104, 110 Stat. 56, substantially revising and supplementing the Federal Communications Act of 1934 and codified at scattered sections of Title 47 of the United States Code, was signed into law by President Clinton on February 8, 1996. Specifically, Section 704(a) of the 1996 Telecommunications Act added the following as 47 U.S.C. § 332(c)(7)(B)(II)(iv):

> No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

Radiofrequency radiation exposure limits are codified at 47 CFR § 1.1310. Local regulation is prohibited only "to the extent that such facilities comply with" these regulations. The Board's ruling concerning the admissibility of the expert witness's testimony prevented the introduction of evidence necessary to the preliminary finding of regulatory compliance. However, no issue concerning the propriety of the Board's ruling is here raised.

standards. However, these nonconformities, including inadequate setbacks concerning which variance relief had been requested, were described as preexisting conditions. The witness asserted that the proposed tower, a self-supporting, gray, steel, lattice structure, as well as its foundation, would be constructed in strict compliance with all applicable codes and regulations, including those having to do with resisting forces created by wind and ice.[14]

A senior radio frequency engineer employed by Omni–Point, testified at length concerning his professional qualifications and experience, the nature of Omni–Point's regulatory authority and licensure, the area of Omni–Point's cellular telephone service north of Quakertown and south of the Lehigh Turnpike interchange, the nature and purpose of certain "drive tests" performed by Omni–Point employees which demonstrated an absence of cellular telephone service or intermittent service along a portion of the Turnpike's Northeast Extension directly to the south of the South Mountain tower site, and the results achieved in reducing the area of inadequate service by experimental antennae placed temporarily at 180 feet and at 210 feet of elevation at the tower site. The witness was unable to respond to the inquiry of the Board's chairman as to whether Omni–Point's cellular service competitors in the area faced similar difficulties in providing adequate service.

Omni–Point's counsel argued that a setback equal to the tower height as required by Township zoning ordinance § 312(E)(57)(b) is unnecessary to protect the public safety because modern, self-supporting towers like that here involved are designed to react to excessive loads and forces by collapsing inward on themselves rather than "falling over like a tree".

14. Applicable regulations include those of the Electronics Industries Alliance ("EIA"); *see, for example,* EIA No. RS–222 and the Telecommunications Industry Association's ("TIA"); *see* TIA No. SP 3–3278 (each of which is entitled "Structural standards for steel antenna towers and antenna supporting structures"); EIA No. TR 116 "Radio transmitting antennas and supporting towers for radio transmitting antennas"; EIAs No. 194 "Microwave relay system towers"; the Building Officials Code Alliance ("BOCA") National Building Code, and the American National Standards Institute ("ANSI") requirements for minimum structural design loads.

R.R. 112a–113a. Following this argument, the Commission rested its case.

The Kennedys' counsel then moved for denial of the application on the basis of the asserted failure of the Commission to establish the facts specified in the Township's zoning regulations[15] and in MPC § 910.2, 53 P.S. § 10910.2, including unnecessary hardship created by unique physical characteristics of the subject property, without which, it was argued, the Board lacked authority to grant variance relief.[16] Omni–Point's counsel responded to the motion, arguing that the evidence previously admitted demonstrated that the variance criteria had been met by the small size and configuration of the Commission's property and by the restraints created by the existing tower use and the need for a tower capable of serving the communication needs of the Commission and the public.[17]

Several of the hearing's attendees, identifying themselves as taxpayers, expressed their support for the Kennedys' motion and raised additional areas of concern as grounds for denial of the variance request including the Board's asserted obligation to protect the expectations of neighboring property owners as to the type of development permitted in the conservation zoning district, a claimed adverse effect of the tower on neighboring property values and interference with the use of neighboring properties, and an increased danger of lightning strikes in the vicinity of communication towers. A neighboring property owner described his hearing impaired son's cochlear implant[18] and his concern, assertedly derived from

15. Citing Township Zoning Ordinance §§ 804(E)(3) and (B)(1) through (5).

16. But see *Hertzberg v. Zoning Bd. of Adjustment of City of Pittsburgh*, 554 Pa. 249, 721 A.2d 43 (1998), in which this Court held that the burden on the property owner in variance cases depends on whether the relief is sought from use or dimensional regulations; with variance relief from dimensional regulations, as are here involved, requiring a lesser burden of proof.

17. No issue concerning the legal sufficiency of the Commission's evidence to justify variance relief is here presented.

18. A cochlear implant is a surgically implanted electronic device designed to provide useful hearing to those afflicted by certain hearing disorders.

certain medical advice, that radio frequency emissions from the tower could create interference with or otherwise impair the functioning of the device. The Chairman announced that the Kennedys' motion would be decided by the final vote of the Board.

The Kennedys' counsel opened the case in opposition to the application by calling a civil engineer to testify about the dangers inherent in communication tower structures including catastrophic structural failure and the expert's conclusion that "there's no way you can design [a tower] so it can never fall over in any particular direction or in any manner"[19], R.R. 140a, as well as the hazard to neighbors[20] and motorists created by falling sheets of ice and icicles more than 100 feet in length which inevitably accumulate and are then dislodged and propelled by the wind from towers constructed in areas like South Mountain which regularly experience extreme winter weather. Finally, the witness described the potential dangers created by the tower construction process itself. Brian Kennedy testified in further support of the concerns expressed by his expert witness and following this presentation, the protestants rested their case in opposition to the application.

The Board requested and received oral argument and the chairman expressed his appreciation to the participants and attendees for their efforts and patience. There then immediately follows in the transcript of the proceedings the parenthetical phrase: "(Hearing briefly recessed)", R.R. 159a, following which the transcript continues with the chairman's statement that the Board is "back in business", that the Board has considered the testimony, opinions, arguments, and statements of concern of the hearing participants and that "[s]ometimes this calls for a compromise." *Id.* After describing the benefits and limitations of compromise generally, the chairman

19. This opinion was offered to rebut the assertion by Omni–Point's counsel that a "fall distance" equal to the tower's height is not required to protect the public safety in connection with modern, self-supporting tower structures.

20. The witness testified that the house most proximate to the tower is about 130 feet distant and other homes are located 140 feet and 200 feet from the tower.

continued his remarks beginning with a formulation from which the Commonwealth Court here deduced an unlawful intent and motive:

> I'm going to make a motion to the board and we'll vote that we do not approve the 200 foot tower that was proposed, but that we approve a compromise at which the parties who brought this application before us will have to work out on their own if this is approved. The present tower is 120 feet. Half of that is 60 feet. My proposal is to allow an additional 60 feet all be it [sic—"albeit"] on a different tower, but a maximum height of 180 feet which would accommodate the Turnpike either at the 175 foot level or perhaps 170 feet level and perhaps also accommodate Omni–Point not to the degree that they want, but to a point where we as a board are providing reasonable accommodations for expansion ... particularly an operation that's been here and successful in the context of serving the public for many, many years.
>
> The proposal that is on the board involves an additional building. We would require that this goes back for site planning review, but my motion is to allow an expansion to 180 feet, which is a compromise over this. They started with 210 feet. They came down to 200. If we allow 180 feet, they will have to find a way to accommodate if they want Omni–Point and the Commonwealth. . . .
>
> Now, that's the compromise I'm proposing. Is there a second?

R.R. 159a–162a.

Board member Parker seconded the motion and, along with the chairman and member Salasky, voted in the affirmative. Board member Stefanko cast her vote in opposition to the motion and the chairman, following an inquiry as to member Salasky's vote, announced the decision of the Board.

As we have indicated, from the record of these proceedings, the trial court could discern no violation of the Sunshine Act while the Commonwealth Court deduced an unlawful motive and illegal action. The Board here concedes, as it has conceded at every stage of these proceedings, that it conducted

quasi-judicial deliberations during the recess noted in the transcript. Relying on Section 708 of the 1998 Sunshine Act, 65 Pa.C.S. § 708, the Board argues that such deliberations are expressly permitted by the Sunshine Act to be conducted in a private executive session. The legislative provision cited includes in pertinent part, the following:

§ 708. Executive Session[21]

(a) Purpose.-An agency may hold an executive session for one or more of the following reasons:

. . . .

(5) To review and discuss agency business which, if conducted in public, would violate a lawful privilege or lead to the disclosure of information or confidentiality protected by law, including matters related to the initiation and conduct of investigations of possible or certain violations of the law and quasi-judicial deliberations.

The authority to conduct an executive session is here of pivotal significance. 65 Pa.C.S. § 704 provides: "Official action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public unless closed under section 708 (relating to executive sessions). . . ."

In determining the meaning and scope of Section 708 of the 1998 Sunshine Act, 65 Pa.C.S. § 708, we must give primary effect to the intent of the legislature as it can be determined from the express language of the legislation itself.[22]

**21.** The term "Executive session" is defined in 65 Pa.C.S. § 703 as "[a] meeting from which the public is excluded, although the agency may admit those persons necessary to carry out the purpose of the meeting."

**22.** *See* the Statutory Construction Act of 1972, the Act of December 6, 1972, P.L. 1339, 1 Pa.C.S. § 1921. The principal stated purpose of the 1998 Sunshine Act and of open meeting statutes generally is to improve the quality of democratic institutions by increasing the knowledge of the electorate as to the critical issues faced by their elected representatives and appointed officials. Public access to government in action "is vital to the enhancement and proper functioning of the democratic process [just as] secrecy in public affairs undermines the faith of the public in government and the public's effectiveness in fulfilling its role in a democratic society." 65 Pa.C.S. § 702 (entitled Legislative findings and declaration). *See also Sierra Club v. Costle,* 657 F.2d 298,

The term "Deliberation" is defined by the Act as "[t]he discussion of agency business held for the purpose of making a decision." 65 Pa.C.S. § 703. The term "agency business" is defined to include "the adjudication of rights, duties and responsibilities. . . ." *Id.* There can be no doubt that a discussion by Board members during the recess of the application then pending and the evidence adduced during the public session just concluded, would constitute "deliberations" as so defined. The position of the Kennedys (and the decision here subject to review) depends on the premise that "deliberations" as so defined took place during the Board's recess.

■■ Neither can there be any serious doubt that zoning hearing boards, just as the zoning boards of adjustment which preceded them, are quasi-judicial bodies which perform formal fact-finding and deliberative functions in a manner similar to that of a court. *Norate Corp. v. Zoning Bd. of Adjustment of Upper Moreland Tp.*, 417 Pa. 397, 207 A.2d 890, 893 (1965); *Esso Standard Oil Co. v. Taylor*, 399 Pa. 324, 159 A.2d 692, 696 (1960) ("[i]t must be remembered that the Board of Adjustment is a quasi-judicial body which passes upon the

400–01 (D.C.Cir.1981): "Under our system of government the very legitimacy of general policymaking performed by unelected administrators depends in no small part upon the openness, accessibility, and amenability of these officials to the needs and ideas of the public from whom their ultimate authority derives, and upon whom their commands must fall." A preference for open governmental processes is among the predilections on which this nation was founded. In 1765 in an essay entitled *A Dissertation on the Canon and the Feudal Law*, in John Adams 60 (Simon & Schuster, 2001), John Adams wrote that "liberty must at all hazards be supported." He continued:

and liberty cannot be preserved without a general knowledge among the people who have a right from the frame of their nature to knowledge, . . . . But besides this, they have an indisputable, unalienable, indefeasible divine right to the most dreaded and envied kind of knowledge, I mean of the characters and conduct of their rulers.

To the same effect, James Madison wrote: A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives. Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 9 The Writings of James Madison 103 (Gaillard Hunt ed., 1910). Reproduced in Thomas J. Moyer, *Interpreting Ohio's Sunshine Laws: A Judicial Perspective*, 59 N.Y.U. Ann. Surv. Am. L. 247, 268 n. 1 (2003)

rights of others"); *Riccardi v. Board of Adjustment of Plymouth Tp.*, 394 Pa. 624, 149 A.2d 50, 52 (1959) (same). Indeed, unlike municipal governing bodies which, in the zoning context, act in both a legislative and a quasi-judicial capacity, zoning hearing boards have only quasi-judicial authority.[23]

We discussed at the outset a number of the statutory provisions which require zoning boards to function in the manner of a court, including the issuance of written final adjudications (with factual findings, legal conclusions, and express reasoning) based on public evidentiary hearings held on published and posted notice, in which all parties have the right to be represented by counsel and to present evidence and argument and to cross-examine adverse witnesses.[24] Moreover, MPC § 908(8), 53 P.S. § 10908(8) expressly prohibits zoning board members from engaging in *ex parte* communications or taking notice of any memoranda, reports, or other documents outside of the formal evidentiary record excepting only the advice of the board's solicitor. In this additional respect as well, zoning boards function in a judicial manner.[25]

**23.** *See* MPC § 909.1, 53 P.S. § 10909.1 (describing the jurisdictional power of zoning hearing boards to "render final adjudications" in nine categories of land use applications, disputes, and challenges). In *Man O'War Racing Ass'n v. State Horse Racing Comm'n*, 433 Pa. 432, 250 A.2d 172, 175 (1969), this Court catalogued the characteristics of the Horse Racing Commission's activities which identified it as a "judicial" agency. These included the need to judge the merits of each application in terms of complicated and multifaceted statutory standards (in the case of zoning boards, compare MPC § 910.2, 53 P.S. § 10910.2 codifying the standards for the issuance of zoning variances); the fact that the racing commission's enabling statute "itself contemplates that the Commission will be making determinations essentially judicial in character" (*Man O'War*, 250 A.2d at 175), *compare* MPC § 909.1, 53 P.S. § 10909.1 (described above); and that "the Commission is instructed that it 'shall have the power to administer oaths and examine witnesses, and may issue subpoenas to compel attendance of witnesses, and the production of all material and relevant reports, books, papers, documents, correspondence and other evidence,' in conjunction with its hearing power" (*Man O'War*, 250 A.2d at 175), *compare* MPC § 908(2)–(9), 53 P.S. § 10908(2)—(9) (investing zoning boards with identical authority).

**24.** *See* footnote 2 above.

**25.** *Compare* Canons 3(A)(4) and 3(C)(1)(a) of the Code of Judicial Conduct (prohibiting judges from considering ex parte communications

As an agency characterized predominantly by judicial characteristics and functions, it is particularly appropriate for zoning boards to deliberate privately. The necessity of collegiality to group decision-making of the highest quality is well established as is the degree to which collegiality and public deliberations are incompatible.[26] The subjects to which zoning

and requiring a judge's recusal in any case where the judge has knowledge of disputed facts from a source other than the evidentiary record). A member of the local governing body, acting in a primarily legislative capacity, has very different responsibilities, as the court explained in *Palm v. Center Tp.*, 52 Pa.Cmwlth. 192, 415 A.2d 990 (1980):

> In serving the public a capable and dedicated supervisor would not rely on [testimony and evidence adduced] at a public meeting. Supervisors, to be informed and to make an intelligent decision, would collect facts and opinions from representatives of these and possibly other agencies in advance of the public meeting. Nor is a supervisor prohibited from listening to and talking with the applicant for a zoning change, whether the applicant be a resident or non-resident, a taxpayer or non-taxpayer. Any person affected by a township ordinance has the right to expect a township supervisor or other official with responsibility in the area to be reasonably cooperative, to listen, and to avoid obstructive tactics. He can advise and make suggestions. If a supervisor recognizes a problem he is free to relate it and discuss it with all interested persons. None of this means a commitment until a decision is made and formal action taken at a public meeting.

*Id.*, 415 A.2d at 992. To the same effect see *Ackerman v. Upper Mt. Bethel Tp.*, 130 Pa.Cmwlth. 254, 567 A.2d 1116, 1119 (1989); *Belle Vernon Area Concerned Citizens v. Board of Comm'rs of Rostraver Tp.*, 87 Pa.Cmwlth. 474, 487 A.2d 490, 493 (1985).

**26.** In *National Labor Relations Bd. (NLRB) v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975), the Court discussed the necessity of privacy to the deliberative process in the following terms with specific reference to the exemption (designated as No. 5 and codified at 5 U.S.C. § 552(c)(5)) of deliberative writings from the documentary disclosure requirement of the federal Freedom of Information Act ("FOIA"):

> The point ... is that the 'frank discussion of legal or policy matters' in writing might be inhibited if the discussion were made public; and that the 'decisions' and 'policies formulated' would be the poorer as a result. ... As a lower court has pointed out, 'there are enough incentives as it is for playing it safe and listing with the wind,' ... and as we have said in an analogous context, '(h)uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances ... to the detriment of the decisionmaking process.' *United States v. Nixon*, 418 U.S. 683, 705, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions. The quality of a particular agency decision will clearly be affected by the communications received by the decisionmaker on the subject of the decision prior to the time the decision is made.... [FOIA] Exemption 5, properly construed, calls for ... the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 150–51, 95 S.Ct. 1504 (some citations and footnotes omitted). No reason appears why the protection by privacy of "the agency's group thinking" as it is occurring in the oral deliberations of the members is any less critical to the quality of the process. Indeed, the Administrative Conference of the United States ("ACUS") concluded in 1984 that

one of the clearest and most significant results of the [federal] Government in the Sunshine Act is to diminish the collegial character of the agency decisionmaking process. The open meeting requirement has generated reluctance to discuss certain important matters; and discussions, when they occur, may not contribute to achieving a consensus position. In some agencies the pattern of decisionmaking has shifted from collegial exchanges to one-on-one encounters, transmission of views through staff, and exchanges of memoranda or notation procedure. The inhibition of collegial exchanges, in turn, impedes the members in the collective exercise of their responsibilities, and tends to weaken the role of the collegium vis-a-vis that of the staff and the agency chairman.... Although the legislative history indicates Congress believed that, after the initial period of adjustment, sunshine would not have a significant inhibiting effect on collegial exchanges, unfortunately this has not been the case.

1 CFR § 305.84-3, 49 FR 29937, 29942 (July 25, 1984). In response to a letter dated February 17, 1995, signed by over one dozen current and former commissioners of multi-member federal executive agencies, the ACUS was again asked to review the federal Sunshine Act with particular emphasis on its effect on the quality of agency decisions. Following a series of open meetings, the receipt of testimony and written commentary, and an extensive literature review, the ACUS concluded

that, generally, true collective decisionmaking does not occur at agency public meetings. Further, the Committee believes the Act also promotes inefficient practices within agencies which themselves contribute to the erosion of collegial decisionmaking and, correspondingly, to a decline in the quality of agency decisions that the public receives.

*Reforming the Sunshine Act: Report and Recommendation by the Special Committee*, Administrative Conference of the United States, 49 Admin. L.Rev. 421, 423 (Spring, 1997). Similarly, the Chairman of the American Bar Association's Administrative Law Section opined that the federal Sunshine Act "may well have diminished the collegial character of agency decision making, created a reluctance of agency members even to discuss certain important agency matters, and shifted the decision-making process to one-on-one discussions between members, exchanging views at the staff level, and exchanging views by written memoranda." William E. Murane, *Chairman's Message*, 37 Admin. L.Rev. V, V (1985). Professors David Welborn, William Lyons, and

boards must apply their statutory authority increase the necessity both of collegiality and privacy. Disputes between neighboring property owners, adjoining homeowners, long-term residents and erstwhile newcomers, citizens' groups and developers, residents and the owners of existing and proposed incompatible neighboring commercial, industrial, and institutional uses of land—these are the regular fare of zoning boards.[27] Emotional rancor of great intensity typically accom-

Larry Thomas concluded in a 1984 Report that the federal Sunshine Act led to diminished collegiality and a procedural shift which compartmentalized decision making and isolated agency members; all to the detriment of the quality of agency decisions. David M. Welborn, et al., *Implementation and Effects of the Federal Government in the Sunshine Act: Final Report for the ACUS*, at 51–2, 64–5 (1984). The Commonwealth's Legislature has recognized the necessity of privacy to collegial decision making in other contexts as well. *See, for example*, the Peer Review Protection Act, the Act of July 20, 1974, P.L. 564, No. 193, 63 P.S. § 425.1 et seq. (ensuring the confidentiality of procedures for the collegial evaluation of the quality and efficiency of the services of professional health care providers).

27. One member of a zoning board has described the intractable disputes regularly encountered by these agencies in the following terms:

Owner-occupied housing is, for the vast majority of residents, the largest asset that they will ever own. Homeowners believe that the value of this huge asset will be affected by the deterioration of neighborhood and municipal-wide conditions. Scores of economic capitalization studies show that they are rational in this belief. As a result, homeowners are exquisitely interested in any neighborhood change or changes in municipal taxes and services that will affect the value of their homes . . . .

It also accounts for the NIMBY ("not in my back yard") syndrome. NIMBYs are mostly nearby homeowners who object to further development within their community. The development may be homes just like the ones in which they live, but the neighbors oppose it because they fear that greater density will adversely affect local road congestion, neighborhood character, crime, taxes and public services.

NIMBYs show up at the zoning and planning board reviews, to which almost all developers of more-than-minor subdivisions must submit. If NIMBYs fail to reduce the scale and density of the project at these reviews, they often deploy alternative regulatory rationales, such as environmental impact statements, historic districts, aboriginal burial sites, agricultural preservation, wetlands, flood plains, access for the disabled and protection of (often unidentified) endangered species at other local, state and federal government forums, including courts of law. I have heard all of these arguments, and others too elaborately bizarre to list, in my ten years as a member of the Hanover, New Hampshire zoning board.

panies disputes of these types. Members of the local zoning board are charged by law to arbitrate these embroilments without passion or prejudice. They are expected and required to resist the intense pressure to which they are subjected from all sides and to decide the issues on their legal merits without regard for the identity or influence of the parties. The legal merits frequently turn on the credibility of and weight to be accorded to the testimony of witnesses appearing before the board; often including public officials and community leaders. Frequently, zoning boards must choose between unpalatable alternatives. Under these circumstances, it is simply not possible for zoning board members frankly to exchange their views in a public forum. The deliberation of matters so charged with emotion and political signification must be cloaked with the protection of privacy if it is to assist the board in carrying out its weighty decisional responsibilities.

■ To the extent that the Board members discussed, during the recess, the pending application looking toward the rendering of a decision, the discussions constituted deliberations by an agency possessed only of quasi-judicial authority within the intendment of the 1998 Sunshine Act. Nevertheless, the Commonwealth Court here concluded that these quasi-judicial deliberations were not the proper subject of an executive session under Section 708(5) of the Act, 65 Pa.C.S. § 708(a)(5), because they were not shown to be protected by another legal privilege. We disagree.[28]

William A. Fischel, *1999 Voting, Risk Aversion, and the NIMBY Syndrome: A Comment On Robert Nelsons Privatizing The Neighborhood*, 7 Geo. Mason L.Rev. 881, 881–82 (1999) (footnote omitted). Another commentator describes one class of dispute frequently encountered by zoning boards as follows:

NIMBY conflicts arise from projects that typically generate widely dispersed benefits while imposing concentrated costs, such as homeless shelters, prisons, airports, sports stadiums, and waste disposal sites. Despite the social desirability of such projects, they often provoke intense local resistance that harnesses the political process to block construction of the proposed facility.

Barak D. Richman, *Mandating Negotiations To Solve The NIMBY Problem: A Creative Regulatory Response*, 20 UCLA J. Envtl. L. & Pol'y 223, 223 (2001/2002) (footnote omitted).

**28.** Even accepting the court's statutory construction, which we do not, the court's conclusion is problematic. Quasi-judicial deliberations are

The conclusion that 65 Pa.C.S. § 708(a)(5) permits an executive session only for those quasi-judicial deliberations concerning privileged subjects, depends on an awkward and ultimately indefensible grammatical construction of the statutory provision. The Commonwealth Court's construction must depend on a reading of the introductory clause—"To review and discuss agency business which, if conducted in public, would violate a lawful privilege or lead to the disclosure of information or confidentiality protected by law"—as an independent

widely considered to be protected by a legal privilege of ancient origin and recent interest. Termed "judicial" or "deliberative," the privilege is closely related to the executive privilege that protects the decision-making process of the chief executive from compelled disclosure. In *Commonwealth ex rel. Unified Judicial System v. Vartan*, 557 Pa. 390, 733 A.2d 1258 (1999), in which we granted allocatur to determine whether the Commonwealth Board of Claims could lawfully issue a subpoena to former Chief Justice Robert N.C. Nix, Jr. commanding his deposition testimony in a contract dispute arising out of the construction of a court house for the Commonwealth Court, Madame Justice Newman's opinion announcing the judgment of the Court includes a scholarly discussion of the origin of the deliberative process privilege and the jurisdictions which have expressly embraced it as a governing legal precept. *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), is there cited in which the United States Supreme Court observed that questioning a judge or administrator about the process by which a decision had been reached would undermine the judicial or administrative process, writing: Just as a judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected. *Vartan*, 733 A.2d at 1263–64 (quoting *Morgan*, 313 U.S. at 422, 61 S.Ct. 999). No reason appears why the process of quasi-judicial decision-making is any less deserving of protection than the judicial or administrative processes. In *LaValle v. Office of General Counsel of Com.*, 564 Pa. 482, 769 A.2d 449, 457 (2001) (involving the Sunshine Act's statutory sibling, the Right–To–Know Law, the Act of June 21, 1957, P.L. 390, *as amended*, 65 P.S. 66.1 et seq.), we again examined, but declined as unnecessary to expressly endorse, the deliberative process privilege; the purpose of which is to allow the free exchange of ideas and information within government agencies. We noted that the privilege benefits the public, and not the officials who assert the privilege and that "the privilege recognizes that if governmental agencies were "forced to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer." " *LaValle*, 769 A.2d at 457. Our principled disagreement with the Commonwealth Court's construction of Section 708(5) of the 1998 Sunshine Act as well as the failure of that court to analyze the effect of our *Vartan* and *LaValle* decisions make it inappropriate in this case to decide whether

criterion that must be met, in order to constitute a proper subject for an executive session, even in the instance of those general topics listed in the remaining clause of the provision— "matters related to the initiation and conduct of investigations of possible or certain violations of the law and quasi-judicial deliberations".

This construction ignores the meaning and function of the term bridging the syntactic gap between the introductory clause and the concluding list of appropriate topics—the word "including." By use of "including," which means "to take in [or] contain within as a constituent, component, or subordinate part of a larger whole,"[29] the legislature telegraphed its intent that the introductory clause and the list are not independent criteria. Instead, the function of "including" in the provision is to denote that the categories of agency business listed at the end of the provision are intended to be a nonexclusive set of examples of agency business which would, if discussed in public, "violate a lawful privilege or lead to the disclosure of information or confidentiality protected by law."

▉ Use of the term "including" in this context means that an agency's reliance on Section 708(5) of the 1998 Sunshine Act, 65 Pa.C.S. § 708(5), to justify as an executive session, a private discussion of agency business other than either (1) the initiation and conduct of investigations of possible or certain violations of law, or (2) quasi-judicial deliberations, would require a demonstration that the matter discussed involved a protected confidentiality privilege. However, when the matter discussed is shown to be the initiation or conduct of investigations ... or quasi-judicial deliberations, then no such demonstration is required because these topics of agency business have been predetermined by legislative fiat to be, "included" within the general category of those topics which, if discussed

quasi-judicial deliberations are protected by a judicial or deliberative process privilege.

**29.** Merriam Webster's Collegiate Dictionary 568 (10th ed. 1993). The more technical synonym is "subsume," a term with primary referents in set logic indicating the relationship between inclusive and included classes. Webster's Third New International Dictionary 1143 (Springfield, Ma. 1971).

in public, would violate a protected confidentiality privilege. To this extent, the decision here subject to review is predicated on an unwarranted construction of the statutory provision at issue. By force of the express terms of 65 Pa.C.S. § 708(5), quasi-judicial deliberations conducted by a zoning hearing board in the matter of a contested application pending before the agency are a proper subject of an executive session from which the public can be lawfully excluded.

This result is consistent with the decision reported as *Appeal of the Emmanuel Baptist Church*, 26 Pa.Cmwlth. 427, 364 A.2d 536 (1976), described by one commentator as Pennsylvania's "leading case" on the degree to which zoning board proceedings are required to be open to the public.[30] In *Emmanuel Baptist Church*, the court below, sitting *en banc*, unanimously held that zoning boards are quasi-judicial agencies subject to the strictures of the Sunshine Act's legislative predecessor.[31] The court further held that the vote of the board members to deny the church's application for a special exception, made in a telephone conversation outside of any public proceeding, violated the central legislative command that "[n]o formal action shall be valid unless such formal action is taken during a public meeting." Section 2 of the 1974 Open Meeting Law, then found at 65 P.S. § 262. *But cf. Babac v. Pennsylvania Milk Marketing Bd.*, 531 Pa. 391, 613 A.2d 551 (1992) (holding that telephone participation in a public meeting by an agency member did not violate the 1986 Sunshine Act).[32]

**30.** Edward H. Ziegler, Jr., Rathkopf's The Law of Zoning & Planning, § 57.71 (West Group 1975).

**31.** The Open Meeting Law, the Act of July 19, 1974, P.L. 486, then found at 65 P.S. §§ 261–269 ("1974 Open Meeting law"), *repealed by* the Act of July 3, 1986, P.L. 388 ("1986 Sunshine Act"). The 1974 Open Meeting Law defined the agencies to which it applied in the broadest terms, expressly exempting only "the judiciary or judicial branch." The court rejected the attempt to categorize zoning boards as the judiciary or the judicial branch. *Emmanuel Baptist Church*, 364 A.2d at 539.

**32.** In *Piecknick v. South Strabane Tp. ZHB*, 147 Pa.Cmwlth. 308, 607 A.2d 829 (1992), *rev'd on other grounds*, 546 Pa. 551, 686 A.2d 1297 (1996), and in *Pae v. Hilltown Tp. ZHB*, 35 Pa.Cmwlth. 229, 385 A.2d 616 (1978), the court held that the board's preparation of its formal

While this result is unobjectionable, the court's adoption and approval in *Emmanuel Baptist Church* of the reasoning of the Florida Supreme Court in the decision reported as *Canney v. Board of Public Instruction*, 278 So.2d 260 (Fl.1973), including that court's holding that quasi-judicial deliberative activities are within the statutory open meeting mandate, cannot be reconciled with the legislative intent expressed in Pennsylvania's 1998 Sunshine Act. The Florida open meeting statute at issue in *Canney*, like the Open Meeting Law construed in *Emmanuel Baptist Church* but unlike the 1998 Sunshine Act here involved, contains no express authority to conduct quasi-judicial deliberations in a private executive session. As the Commonwealth Court noted, lawful nonpublic executive sessions under Section 3 of the Open Meeting Law then found at 65 P.S. § 363, were limited in their subjects to disciplinary charges and labor negotiations. *Emmanuel Baptist Church*, 364 A.2d at 540 n. 3. *See* Section 3 of the Act of July 19, 1974, P.L. 486, No. 175, 65 P.S. § 263 (repealed).

The court in *Emmanuel Baptist Church* quoted at length and with express approval from the opinion of the Florida Supreme Court in *Canney*, including the admonition to agencies aggrieved by the expansive construction of the open meeting mandate that: "the remedy lies in the halls of the Legislature and not in efforts to circumvent the plain provisions of the statute by devious ways in the hope that the judiciary will read some exception into the law." *Emmanuel Baptist Church*, 364 A.2d at 540 (quoting *Canney*, 278 So.2d at 263–64). The Pennsylvania legislature has so acted. Section 8 of the 1986 Sunshine Act, 65 P.S. § 278 (repealed), from which Section 708 of the 1998 Sunshine Act was directly derived without substantive revision, expanded the proper subjects of an executive session to include other employee matters, the purchase or lease of real property, consultation

written decision in private does not violate the 1986 Sunshine Act's or the 1974 Open Meeting Law's open meeting mandate. See also *Sheetz, Inc. v. Phoenixville Borough Council*, 804 A.2d 113 (Pa.Cmwlth.2002), in which the court rejected the contention that the 1998 Sunshine Act was violated by the failure of the governing body to notify the applicant in writing of the public meeting at which an adverse decision was to be announced.

with attorneys and other professional advisors concerning litigation strategy and, most significant to the question here involved, confidential agency business including quasi-judicial deliberations.

Moreover, *Canney* notwithstanding, the weight of authority in other jurisdictions favors a construction of open meeting legislation so as to permit private quasi-judicial deliberations. Indeed, a number of the open meeting statutes of other states contain an express exemption for quasi-judicial deliberations as unambiguous as that here involved.[33]

One commentator states the rule generally prevailing in our nation's courts as follows: "[T]he requirement that a public hearing be held does not preclude the board of adjustment from meeting in executive session. The board may deliberate in private, but evidence must be received, and official action must be taken and announced in public session." Robert M. Anderson, American Law of Zoning, § 22:25 (3d ed. 1986) (footnotes omitted).[34] Another commentator states the gener-

**33.** E.g., Alaska Stat. § 44.621310(d)(1) (1980) (exempting quasi-judicial bodies 'when holding a meeting solely to make a decision in an adjudicatory proceeding'); Hawaii Rev. Stat. § 92–6(a)(2) (act not applicable "to adjudicatory functions exercised by a board"); Kan. Stat. § 75–4318(f)(1)((f) The provisions of the open meetings law shall not apply: (1) To any administrative body that is authorized by law to exercise quasi-judicial functions when such body is deliberating matters relating to a decision involving such quasi-judicial functions); Md. Stat. art. 76A, § 9 (Repl. 1980) (act does not apply to 'a public body when exercising ... quasi-judicial functions'); N.Y. Pub. Off. Law § 108(1) (Nothing contained in this article shall be construed as extending the provisions hereof to: 1. judicial or quasi-judicial proceedings); OR.Rev. Stat. § 192.690(1) ("shall not apply to the deliberations of ... state agencies conducting hearings on contested cases") W. Va.Code § 6–9A–2(4) (definition of "meeting" covered by the act does not include: "(A) Any meeting for the purpose of making an adjudicatory decision in any quasi-judicial, administrative or court of claims proceeding").

**34.** The text draws support for the general proposition from cases decided in Wisconsin (*State ex re. Cities Service Oil Co. v. Board of Appeals*, 21 Wis.2d 516, 124 N.W.2d 809 (1963)), Missouri (*Greater Garden Avenue Area Ass'n v. Webster Groves*, 655 S.W.2d 760 (Mo.App. 1983)), New Jersey (*Whispering Woods at Bamm Hollow, Inc. v. Middletown Planning Bd.*, 220 N.J.Super. 161, 531 A.2d 770 (Law Div.1987), and *Hudanich v. Borough Council of Avalon*, 183 N.J.Super. 244, 443 A.2d 777 (Law Div.1981)), New York (*Concerned Citizens Against Crossgates v. Guilderland Zoning Bd. of Appeals*, 91 A.D.2d 763, 458 N.Y.S.2d

al principle as an obvious truth: "[a zoning] board may, of course, hold executive or deliberative meetings or sessions from which the public is excluded." Eugene McQuillan, The Law of Municipal Corporations, § 25.263 (3d. ed. 1999).[35]

It is, after all, no coincidence that this Court, just as each of the Commonwealth's appellate courts, considers its judicial deliberations to be the most confidential and private of all of its activities. An atmosphere of complete confidentiality is seen to be essential to the candid and forthright exchange of views necessary to decision-making of the highest quality. The deliberations of quasi-judicial agencies are no less dependent on such an atmosphere of confidentiality. The Sunshine Law presents no impediment to the private deliberations of such quasi-judicial agencies. To the extent that the decision here subject to review supports a contrary construction of 65 Pa.C.S. § 708(5) as generally requiring public agency quasi-judicial deliberations or as requiring to be public those quasi-judicial deliberations which are unprotected by some other privilege of confidentiality, it is disapproved.

■ The Commonwealth Court's decision, as we have discussed, was also grounded in the conclusion that the evidence adduced before the Zoning Board would admit of no finding other than that the Board conducted unlawful, formal action during the private recess. Again we must disagree. We have described the hearing conducted by the Board on January 11, 1999 in considerable detail to underscore the nature of these public proceedings. This is not a case where an agency, after conducting extensive private discussions, met briefly in public

13, (1983), *Addesso v. Sharpe*, 44 N.Y.2d 925, 408 N.Y.S.2d 8, 379 N.E.2d 1138 (1978), and *Orange County Publications v. Council of Newburgh*, 60 A.D.2d 409, 401 N.Y.S.2d 84, *aff'd*, 45 N.Y.2d 947, 411 N.Y.S.2d 564, 383 N.E.2d 1157 (1978)), Massachusetts (*Yaro v. Board of Appeals*, 10 Mass.App.Ct. 587, 410 N.E.2d 725 (1980)), and Washington (*State ex rel. Carpenter v. Everett Bd. of Adjustment*, 7 Wash.App.930, 503 P.2d 1141 (1972)).

**35.** Citing in support cases decided by the appellate courts of Maryland (*Sullivan v. Northwest Garage and Storage Co.*, 223 Md.544, 165 A.2d 881 (1960)), Massachusetts (*Elmer v. Board of Zoning Adjustment of Boston*, 343 Mass. 24, 176 N.E.2d 16 (1961)), and New York (*Eckerman v. Murdock*, 276 A.D. 927, 94 N.Y.S.2d 557 (1950))

to "rubber stamp" a series of decisions made privately. The transcript reveals that the public session before this Board prior to the recess dealt exhaustively with the nature of the application and its necessity, the property and the neighborhood, the controlling local regulations, and the legal issues implicated by the Commission's application for relief. Extensive expert testimony was presented to the Board both by the Commission and by the neighbor protestants. Comments were received and considered from a dozen or more non-party attendees. Board members discussed the facts and the issues in public with each other, the parties, their witnesses, and with other attendees. Every conceivable perspective on the matter received a thorough public airing.

There is no doubt that at the conclusion of these extensive public proceedings, the Board members met in private to deliberate. They had every right to do so under the law and we have described some of the considerations that would motivate a conscientious quasi-judicial agency, recognizing that collegiality and a frank exchange of views are necessary to decision-making of the highest quality, to meet in private for this purpose.

Nevertheless, the Commonwealth Court rejected the factual determinations of the Board and the trial court and found unlawful conduct grounded in nothing more compelling than the grammar of the chairman's post-recess statement that: "I'm going to make a motion to the board and we'll vote that we do not approve the 200–foot tower that was proposed, but that we approve a compromise...." R.R. 159a. In the court's view, the phrase "we'll vote" compels the conclusion that the Board "predetermined" its vote during the preceding private session.[36]

36. Compare *Palm v. Center Tp.*, 52 Pa.Cmwlth. 192, 415 A.2d 990, 991–92 (1980), in which the court affirmed on the decision of President Judge Kiester of the Court of Common Pleas of Butler County, described as both succinct and sound, including the following: "Appellants apparently believe and would have this Court infer from all the facts that the Supervisors decided in some unknown manner upon their final action prior to the meeting when the 90 acres was re-zoned. The facts do not support such a conclusion. To so find the Court would be

We are unpersuaded by the court's logic. First, the phrase "we'll vote", considered in context, means nothing more than that what follows represents the chairman's proposal on which he will shortly solicit the formal concurrence of the other participating members. As we have noted above, the hearing transcript reveals that Board member Stefanko cast her vote in opposition to the chairman's compromise motion, and the chairman was uncertain of and had to inquire as to the nature of member Salasky's vote before he could announce the decision of the Board. With four members of the Board participating following member Delorenzo's recusal, the chairman's uncertainty as to member Salasky's vote, in combination with the prior negative vote of member Stefanko, negates any implication that the public vote was preordained in private. Indeed, these circumstances, unless entirely disingenuous on the chairman's part, compel the conclusion that the outcome remained uncertain until the votes were cast and counted. No one has here argued that the chairman feigned his uncertainty as to member Salasky's vote and the record would provide no support for such an argument.

 It must also be emphasized, as the Kennedys concede[37] , that they were charged with the burdens of proof and persuasion to establish a violation of the 1998 Sunshine Act. *See George Clay Steam Fire Engine*, 639 A.2d at 903. The trial court concluded that these burdens were not here met, writing:

> guessing about the 'thought' processes of each Supervisor." To the same effect see *Conners v. West Greene Sch. Dist.*, 131 Pa.Cmwlth. 95, 569 A.2d 978 (1989), in which the court, once again affirming on the decision of Judge Kiester for the trial court, rejected a Sunshine Act complaint grounded only in an allegation that school board members apparently engaged in private discussions of the budget. The intermediate appellate court agreed that these allegations were insufficient on their face and that any such informal discussions, assuming their occurrence, would not violate the Act. In *League of Women Voters of Pennsylvania v. Commonwealth*, 683 A.2d 685 (Pa.Cmwlth.1996), the court rejected an attempt to infer a Sunshine Act violation on the part of a conference committee of the General Assembly from the fact that the conferees compiled an extensive conference committee report *prior* to the conference committee's first public meeting.

**37.** Brief of Appellees at 7.

The record has not been developed with depositions or trial testimony of the Board members to learn exactly what was discussed during the recess. Was this an informal debate among the Board members about the pros and cons of the tower matter or was it something more sinister. We do not know from this sparse record.

Slip Op. filed October 5, 2000 at 9.

The Kennedys brought this Sunshine Act challenge by means of an action in declaratory judgment. As the plaintiffs in that action, charged with the burden to prove a violation, the Kennedys utilized none of the mechanisms for pretrial discovery, called none of the Board members to testify at trial, and relied entirely on the record made before the Board. We agree with the trial court that the record is inadequate to overcome the presumption of regularity and legality that obtains in connection with proceedings of local agencies. *See, Albert v. Lehigh Coal & Nav. Co.,* 431 Pa. 600, 246 A.2d 840, 845 (1968) ("There is a prima facie presumption of the regularity of the acts of public officials which exists until the contrary appear"); *Mamallis v. Borough of Millbourne,* 401 Pa. 375, 164 A.2d 209, 211 (1960) (same); *Wilson v. City of New Castle,* 301 Pa. 358, 152 A. 102, 104 (1930) ("Executive officers are clothed with the responsibility of originating and executing plans for the public good; the presumption is that their acts are on such considerations and their decisions reached in a legal way after an investigation."); *Falkinburg v. Venango Tp.,* 297 Pa. 358, 147 A. 62, 64 (1929) ("unless the presumption of regularity is rebutted, it is conclusive").

Moreover, even if it could be fairly inferred from the transcribed record that the discussion of the Board members in private during the recess was such as to permit the chairman to draw certain conclusions as to the likely outcome of a vote on a motion to deny the application for a 200–foot tower but to grant relief for a 180–foot tower, those facts alone would not establish a Sunshine Act violation. We have now made clear that quasi-judicial deliberations are a proper subject of a private executive session. Deliberations, as defined, consist of "discussions of agency business held for the purpose

of making a decision." Section 703 of the Sunshine Act, 65 Pa.C.S. § 703. Whether or not private deliberations may lawfully include some manner of "straw voting" is a question this case does not present since there is no evidence of such action. It should be noted, however, that the Commonwealth Court has held that straw voting can be a permitted aspect of an executive session. *Morning Call, Inc. v. Board of Sch. Directors of Southern Lehigh Sch. Dist.*, 164 Pa.Cmwlth. 263, 642 A.2d 619, *appeal denied,* 539 Pa. 698, 653 A.2d 1235 (1994).

At most it is possible to deduce from this record that the chairman developed during the recess discussion, a reasonable prediction of the outcome of a vote on his 180–foot compromise. Such a prediction requires nothing more than attention to the views expressed by the other members on the issues before them. It would be difficult in the extreme for the members of such an agency conscientiously to discuss the substantive issues before them without creating the raw material from which such a prediction could be fashioned by any of their number. Nothing in the 1998 Sunshine Act suggests that the formation of such predictions is unlawful and we reject the Commonwealth Court's logical leap to the conclusion that unlawful conduct here occurred.

Our resolution of these issues makes it unnecessary for us to decide whether the Commission is correct in charging the court below with additional error first in rejecting the conclusion of the trial court that any impropriety during the recess was cured by the subsequent public vote; and, finally, in overturning the trial court's refusal to invalidate the Board's public formal action as a discretionary act expressly authorized by the 1998 Sunshine Act. On these subjects it will here suffice to note that the 1998 Sunshine Act, like the 1986 Act before it, provides:

Should the court determine that the meeting did not meet the requirements of this act, *it may in its discretion,* find that any and all official action taken at the meeting shall be invalid.

Section 13 of the 1986 Sunshine Act, 65 P.S. § 264 (repealed; emphasis supplied); Section 713 of the 1998 Sunshine Act, 65 Pa.C.S. § 713.

In *Ackerman v. Upper Mt. Bethel Tp.*, 130 Pa.Cmwlth. 254, 567 A.2d 1116, 1120 (1989), the court, by Judge (later President Judge) Craig, rejected the contention of the protestants "that because the group's afternoon meeting violated [1986 Sunshine Act] section 4, the supervisor's vote at the evening public hearing must be invalidated under section 13 of the Act" and held that the trial court properly exercised its discretionary authority to decline invalidation as a sanction for an unlawful private discussion among a majority of the members of the governing body concerning a pending zoning application followed by formal action taken later at a public meeting. The court reasoned:

> This court is not prepared to decide—because this case does not require it—that, if a decision is reached at an unlawful private meeting, the body is disabled from reiterating the same decision at a subsequent public meeting. In drafting the Act, the legislature failed to define whether a private meeting which violates the Act taints a later open meeting and decision on the same agency business, or whether the later open meeting may have some curative effect upon the earlier violation. Taking into consideration the purpose of the Act, legislative clarification on this particular point would be desirable

*Id.*, 567 A.2d at 1121. Such legislative clarification concerning the proper scope of invalidation as a remedy for 1986 Sunshine Act violations as has been forthcoming consists of Section 710.1(B) of the 1998 Sunshine Act, 65 Pa.C.S. § 710.1(B), entitled "Limitation on judicial relief", which makes invalidation unavailable as a remedy where the meeting's only violation is a failure to provide a reasonable opportunity for comment by residents and taxpayers. The question raised by Judge Craig remains unanswered.

The court's reluctance to invalidate legislative action taken at a properly noticed public meeting was also grounded in a careful analysis of the statutory formulation.

Furthermore, under section 13 [of the 1986 Sunshine Act], the legislature granted discretion to the court to invalidate "... any or all official action taken at the [closed] meeting ..." Certainly, if action taken at an unlawful private meeting is the only action ever taken on the subject, it could be invalidated. However, section 13 does not expressly permit courts to invalidate "official action" taken at a public meeting occurring after a private meeting held in violation of section 4.

*Ackerman*, 567 A.2d at 1120. Section 713 of the 1998 Sunshine Act provides no greater clarity on this subject.

In upholding the trial court's refusal to invalidate the formal action in *Ackerman*[38], the Commonwealth Court relied on the nature of the public proceedings, as revealed by a review of the transcript, which followed the unlawful, private meeting. The appellate court emphasized that expert witnesses testified both in favor of and in opposition to the proposed zoning amendment, that "numerous citizens" posed questions and presented commentary, and that "[t]here was extensive discussion of the issues" including those raised by citizen attendees, and of the" advantages and disadvantages of the proposal to the Township". *Ackerman*, 567 A.2d at 1120. On these bases, the court held that the trial court did not abuse its sound discretion in refusing to invalidate the formal action.

Each of the characteristics of the public hearing in *Ackerman* that led the court to affirm the trial court's refusal to sanction the violation by invalidation is equally true of the public proceedings in this case. The only distinction between these facts and those in *Ackerman*, albeit a distinction on which the Commonwealth Court here expressly relies, is that in *Ackerman*, the discussions took place in a public session which followed the private session and here the extensive public discussions immediately preceded the private session which was then immediately followed by another public ses-

---

**38.** Accord *Jeske v. Upper Yoder Tp.*, 44 Pa.Cmwlth. 13, 403 A.2d 1010 (1979), as the first of a series of cases in which the court held that a harmless failure to abide by the technical requirements of the Sunshine Act will not require the invalidation of formal action taken at an otherwise lawful, public meeting.

sion during which the formal action sought to be invalidated took place. Neither the decision subject to review nor the Kennedys' arguments point to any authority from which this factual distinction could be given controlling significance. *Cf. Bradford Area Educ. Ass'n by Lutz v. Bradford Area Sch. Dist.*, 132 Pa.Cmwlth. 385, 572 A.2d 1314 (1990) (affirming the trial court's refusal to invalidate the school board's adoption of a reorganization plan at a public meeting following private meetings some six months earlier which were alleged to have violated the 1986 Sunshine Act).[39]

Moreover, the Commonwealth Court's conclusion in this case that the trial court abused its discretion in failing to invalidate the formal action taken publicly to approve in part the Commission's application, receives supporting argument neither in the decision itself nor in the written submission of the appellees.

We note, finally, that the Commonwealth Court has frequently held that subsequent public action can serve to "cure" the effect of prior formal action taken unlawfully in private. *Association of Community Organizations for Reform Now v. Southeastern Pennsylvania Transp. Auth.*, 789 A.2d 811 (Pa. Cmwlth.), *appeal denied*, 569 Pa. 695, 803 A.2d 736 (2002); *Ackerman*, 130 Pa.Cmwlth. 254, 567 A.2d 1116; *In re Petition of the Hazleton Area Sch. Dist.*, 107 Pa.Cmwlth. 110, 527 A.2d 1091 (1987); *In re Avanzato*, 44 Pa.Cmwlth. 77, 403 A.2d 198 (1979). No contrary authority is here offered nor any reason why such a cure, had it been needed, would have been ineffective.

**39.** One commentator reports that of thirty-eight states with open meeting laws that authorize invalidation as a sanction, eleven of the said laws provide for automatic invalidation. The remaining twenty-seven laws include some which permit invalidation only if the violation was "willful" or the equivalent and others which exempt from invalidation various categories of agency action such as public contracts or public debt. Others, like that of Pennsylvania, expressly authorize discretion in administration of the sanction and provide for a time limit beyond which invalidation will not be available. Charles N. Davis, Milagros Rivera–Sanchez, Bill F. Chamberlin, *Sunshine Laws and Judicial Discretion: A Proposal for Reform of State Sunshine Law Enforcement Provisions*, 28 Urb. Law. 41, 49–50 (1996).

For all of these reasons we reverse the Order of the Commonwealth Court.

Chief Justice CAPPY files a concurring opinion in which Justices CASTILLE and NIGRO join.

Chief Justice CAPPY concurring.

I join the majority's decision to reverse the order of the Commonwealth Court. I write separately to emphasize that more specifically and respectfully, I join the majority opinion insofar as it concludes that the Upper Milford Township Zoning Hearing Board (Board) is a quasi-judicial body; that the Board held an executive session within the meaning of Section 708(5) of the Sunshine Act, 65 Pa.C.S. § 708(5), when it engaged in quasi-judicial deliberations during its recess; and that the evidence of record did not support the Commonwealth Court's conclusion that the Board took unlawful official action during that recess.

Justices CASTILLE and NIGRO join this concurring opinion.